and the cases therein cited, being sufficient to show that this power has been frequently exercised. My conclusion, therefore, is that the defendant should be enjoined from in any way using, in connection with placing upon the market or selling its goods, the name of the "De Long Hook & Eye Company." Judgment accordingly for plaintiffs, with costs, and an allowance to be fixed.

---

(10 Misc. Rep. 614.)

## ROGERS et al. v. NEW YORK & T. LAND CO. et al.

(Supreme Court, Special Term, New York County. December, 1894.)

CORPORATIONS—ISSUE OF SCRIP—RIGHTS OF SCRIPHOLDERS.

Railroad bondholders accepted land in payment of their bonds, and appointed a committee to devise a plan by which the amount of the bonds might be realized out of the land. The plan of the committee, which was adopted, was that a corporation should be created to which the land should be conveyed, and that the corporation should issue a certain amount of stock and scrip to each bondholder; that the scrip should be receivable in payment of 75 per cent. of the price of land at regular selling rates, with an option to the company to retire the scrip by the payment of its par value. *Held*, that the corporation took the land subject to a trust in favor of the scripholders, and was obliged to accept scrip in payment of land, as provided in the plan of the committee, and, in case of sales of land to others, 75 per cent. of the proceeds was to be applied to retiring the scrip, and 25 per cent. was for the benefit of the stockholders.

Action by Jacob S. Rogers and others against the New York & Texas Land Company and others for an accounting. Judgment for plaintiffs.

Julien T. Davies, for plaintiffs.
Thomas G. Shearman, for defendants Pearsall and others.
Noah Davies, for defendant New York & T. Land Co.

INGRAHAM, J. In view of the fact that this case has received such a thorough discussion by Mr. Justice Barrett, before whom it was first tried, and by the court of appeals (32 N. E. 27), when the appeal from Mr. Justice Barrett's judgment was before it, but a short statement of the facts will be necessary to the determination of the question that I have to decide. Counsel for the defendants strenuously insist that this case now before the court is a new case, and that I should not be governed by the decision of the court of appeals on the reversal of the former judgment; and various expressions in the opinion of the court are cited to show that the court misconceived the question before it, and that certain controlling facts which were assumed by the court of appeals to exist have been proved on this trial to have no existence. The interests of the parties to this action in the lands of the defendant the New York & Texas Land Company depend upon the fact of the conveyance of the land by the railroad company to the trustees in satisfaction of the bonds of the railroad company, and to the construction to be given to the subsequent report, and resolution adopting that report,

under which the lands were conveyed to the land company; and all this was before the court of appeals, and it was the construction given to these instruments, and the acts of the parties under them, that determined the question decided by the court of appeals. To that decision, with all of its logical consequences, I am bound to give full force and effect, and I can see nothing proved upon this trial that would seriously affect the conclusion at which that court arrived.

Prior to the 1st day of November, 1879, there existed in the state of Texas a railroad company known as the "International & Great Northern Railroad Company." That company was the owner of certain lands in Texas, which had been granted by the state of Texas to two railroad companies that had been consolidated, the consolidated company being the said International & Great Northern Railroad Company. That company was also the owner of certain stock in a corporation organized under the laws of the state of New York, and known as the "Texas Land Company." The railroad company had issued and sold certain bonds secured by a mortgage upon its property known as the "second-mortgage bonds"; and on November 1, 1879, there were outstanding of these bonds $4,959,000. Some time prior to this 1st day of November, 1879, said railroad company, having been unable to pay the interest upon its bonds, had become insolvent, and its property had been placed in the hands of receivers. Upon a reorganization of that company, it was proposed to convey, for the benefit of the holders of these second-mortgage bonds, the lands owned by the said railroad company, together with its stock in the Texas Land Company; and the facts in regard to that transfer are alleged in the complaint and admitted by the answer, as follows:

"In pursuance of said reorganization, all right, title, and interest of said International Railroad Company and said International & Great Northern Railroad Company in and to the lands, land grants, land certificates, situated in the state of Texas, owned by said companies, or by any of them, were conveyed, and the said eighty-six per centum of the capital stock of the said Texas Land Company, owned by the said International & Great Northern Railroad Company, and all city and county bonds owned by said companies, or by any of them, were transferred by said companies to John S. Kennedy, Samuel Thorne, and William Walter Phelps, as trustees for the owners and holders of the said second mortgage and convertible bonds; that said land so conveyed, and stock and bonds so transferred, were accepted by said bondholders in full payment and satisfaction of all claims against said companies, and against any of them."

These lands and this stock, thus having become the property of these second-mortgage bondholders, received in satisfaction of the obligation of the railroad company to pay the bonds, the question as to how they were to be made available to the bondholders was presented. These second-mortgage bondholders had, prior to this time, appointed a committee of their own number, known as the "purchasing committee," to represent them upon the reorganization of the railroad company; and the bondholders authorized and directed this purchasing committee to prepare and report to them a plan by which this land and stock could be made available to the bondholders. In pursuance of such authority, this purchasing com-

mittee did prepare and report to the bondholders a plan under which the defendant the New York & Texas Land Company was incorporated, and all of the property held for the bondholders was conveyed to it; and from the report made to these bondholders, and the resolution of the bondholders adopting that report, and the form of the scrip certificate issued by that corporation to the bondholders, the court of appeals has deduced certain legal propositions which it is now my duty to carry into effect.

The situation of the parties at this time must not be lost sight of. The bondholders were creditors of this corporation, and in payment of their debt had received certain specific real and personal property. The property was of a character that rendered an immediate sale of it, at anything like a fair price, impossible. It was clearly impossible to partition these lands among the various bondholders, and the only way that they could be made available, and the bondholders ultimately receive any substantial sum, was to hold the lands, sell them as they became salable, and divide the proceeds among the bondholders according to their several interests. This was clearly the intent of the framers of this plan. Every word of the report shows it. And while it is clear that the committee and all interested realized that the value of these lands, if forced for immediate sale for cash, was much less than the amount due on the bonds, yet the committee were satisfied that their future value was great, and would ultimately realize sufficient to pay these bonds and interest in full. Entertaining these views, it was entirely reasonable to suggest that in the plan adopted there should be a total capitalization equal to the amount due upon the bonds, and the interest which would mature upon the bonds up to the time that they became due. There could be no fraud upon any one. The lands were to be the capital of the proposed corporation, and the obligations and the stock of the company represented such capital. I think this was accomplished by the plan proposed and adopted. A short analysis of the report of the committee will make this clear. The report, after reciting conveyances of the land and stock to the committee of the bondholders, which were to be accepted in payment of their bonds, states that the committee had concluded that it was expedient for the second-mortgage bondholders to organize a corporation under the laws of the state of New York, and that they had accordingly taken the preliminary steps for that purpose. The corporation was to have a capital stock of $1,500,000, 10 per cent. of this capital to be paid in cash, and the remainder to be paid by conveyance to the company of the lands and stock to that amount, namely, $1,350,000. The report then proceeds as follows:

"But as the property of the new company will, in fact, greatly exceed in value the amount of nominal capital, it has been deemed advisable that the corporation thus formed should issue scrip to its stockholders pro rata, entitling them to an amount of land corresponding to the difference between the capital and the probable ultimate value of the lands when they shall be open for settlement."

This, then, was the scheme adopted by the committee: The corporation was to be organized with a capital of $1,500,000; that

capital stock was to be paid for in cash by payment to the company of $150,000, and by the conveyance of lands to the company for the balance, namely, $1,350,000. But as the value of the lands held for the benefit of the stockholders greatly exceeded that amount of $1,350,000, scrip was to be issued to the stockholders to represent the balance between the capital and the probable ultimate value of the lands when they should be open for settlement. The report then discussed the probable ultimate value of the lands, and determined that that value would be the entire amount of the outstanding bonds and matured coupons, and the committee, therefore, recommended "that the new corporation should issue scrip to the amount of $6,000,000, to be divided pro rata among its stockholders, and to be receivable by the company in payment of seventy-five per cent. of the price of its lands at its regular selling rates, with an option to the company to retire the scrip from time to time by the payment of its par value, and liberty to purchase it out of the company's surplus funds under public notice and sealed proposals, at the lowest prices at which it may be offered." This report was presented at a meeting of the bondholders, when a series of resolutions were unanimously adopted. By these resolutions it was resolved that the report of the purchasing committee "submitted this day be, and is hereby, accepted and approved." It was further resolved "that the said trustees are hereby authorized and directed to grant, convey, assign, and transfer all of the said lands, Texas Land Company's stock, city and county bonds and proceeds thereof, together with all other property received by them as such trustees, to the New York & Texas Land Company, Limited, the capital stock of which shall consist of 30,000 shares, each of the par value of $50, and that six shares of such stock shall be issued in exchange for each of the said second-mortgage and convertible bonds, with all coupons thereon, bearing date since February, 1874." There has been some criticism by the defendant as to the exact terms of the resolution that "accepted and approved the report," and it is claimed that the recommendations of the report were not in all respects adopted, but were modified by the provisions of the subsequent resolution. I think, however, reading both report and resolution together, it was clearly the intention of the meeting to adopt the recommendations of the committee, and that the resolutions were intended to carry those recommendations into effect. The resolutions already referred to accepted the transfer of the lands, directed them to be conveyed to the corporation which the report proposed should be organized, and provided for the distribution of the capital stock pro rata among the bondholders; and, to carry out the further recommendation of the committee as to the issue of scrip, a resolution was then passed requesting the corporation to issue to each shareholder—meaning to the holder of each share—scrip to the nominal amount of $200, which, in the aggregate, would amount to the $6,000,000, by the report recommended to be issued; said script to be "receivable in payment for 75 per centum of the price of its lands at the regular selling rates of the company, or, at its [the corporation's] option, payable in cash at par, with liberty to the said company to purchase

any part of such scrip at such prices as may be hit upon between it and the holders thereof, not exceeding its par value." An additional resolution was then passed, providing that the stock and scrip of the said company, "in the proportions heretofore stated, shall be accepted by the holders of the second-mortgage and convertible bonds aforesaid, or by the purchasing committee on their behalf, in full satisfaction thereof, and shall be apportioned among the bondholders in proportion to the amount of bonds and coupons belonging to them." It was thus the "stock and scrip" that was received in payment of the bonds, and the "stock and scrip" that was issued as the consideration for the transfer of the land and stock to the company.

Under the terms of this resolution the corporation was organized, and the stock and scrip issued. The form of the scrip that was ultimately adopted, and which was issued to the bondholders, each represented the nominal value of $1,000, and was in the following form:

"This is to certify that ——— is the owner of land scrip of the New York & Texas Land Company, Limited, to the amount of one thousand dollars par value. This certificate will be received by the company in payment for seventy-five per centum (75 per cent.) of the price of the company's land, at the regular selling rates to be by it fixed from time to time. It is redeemable, at the option of the company, at any time by the payment of its par value in cash to the holder."

Upon the issue of the stock and this scrip to each bondholder, the plan proposed by the committee was carried into effect. The company was the owner of the land, and each bondholder had become a stock and scrip holder in the company, and thus interested in a proportionate amount of the lands that had been conveyed to the bondholders in satisfaction of the obligation created by the bond. The consideration of the issue of the stock and scrip is stated in the report of the committee. The stock was paid for by the conveyance to the company of lands and stock of the Texas Land Company to the amount of the stock issued by the New York & Texas Land Company, and the scrip was issued in consideration of the transfer to the company of the balance of the lands not necessary to pay for the issue of the stock, and the value of these lands was stated by the report to be $7,500,000. It was entirely immaterial whether that conveyance was in one or several deeds. The company got the land, and as consideration for that land it was to issue the stock and scrip, and the question presented in this action is, what right or interest in these lands did each scripholder acquire by the issue to him of the scrip to which he was entitled?

It is clear that so long as the stock and scrip remained in the possession of the same person, and none of the scrip was canceled by the company, it made no particular difference whether the proceeds of the sale of the land were all paid to the stockholder in the shape of dividends, or the amount received for the sale of lands was first used to redeem the scrip. As soon, however, as one of the stockholders parted with either his stock or his scrip, or as soon as the company purchased any of the scrip and canceled it, then it be-

came necessary to determine the interest of each of the remaining scripholders in the lands or their proceeds. This scrip did not constitute a debt of the company, or, in other words, the company was not indebted to the scripholders in any amount, payable at any particular time. The scripholder could not, therefore, be said to be a creditor of the company in any amount. There was no express provision in the scrip certificate that the company should pay to the holder any sum of money. If the holder wished to buy lands of the company in Texas, he could use the scrip for the payment of 75 per cent. of the value of the lands purchased. There was no obligation on his part to so use the scrip. That was a privilege of the scripholder. But it was clearly the intention of the parties that this scrip should represent something, and that, although the holder did not wish to purchase land and use the scrip for that purpose, he was still to be entitled to receive at some time the benefit that would result to the company upon the sale of land to others. This intention could only be effectuated in one of two ways, and both methods were provided for by the provisions of the scrip itself, either by a purchase by the company of the scrip, after public tenders, at a price to be agreed upon, not exceeding its par value, or by payment of the scrip in cash at par. It was the company that was given the option as to which of these methods should be adopted to retire this scrip. If they could purchase the scrip at less than par, they had the right to do so, but they were bound to use the proceeds of the land sold by them which represented the scrip, so as to retire it in one of the ways mentioned.

Thus the property that was conveyed to the corporation was impressed with an implied trust in favor of these scripholders, whereby the corporation became obligated either to convey the lands to the scripholders upon delivery of the scrip for 75 per cent. of its selling price and payment of the balance, 25 per cent., in cash, or, upon the sale of the lands for cash, to hold 75 per cent. for the benefit of the scripholders, that 75 per cent. to be applied by the company, either in purchase of scrip outstanding at a price not exceeding par, or the redemption of the scrip at par. Look for a moment at the consequences that would result from holding that no such trust existed. Suppose that within one month after the corporation had received a conveyance of this land it had been able to sell it en bloc for the par value of the stock and scrip, viz. $7,500,000. If the position of the defendants is sound, it could have divided that whole amount among its stockholders, and the holders of the scrip would have had no lands to purchase, and nothing to represent the scrip. It appeared upon the trial that the land conveyed to the company consisted of what was known as agricultural land and dry land, the agricultural land being much more valuable than the dry land. The president of the corporation testified that substantially all of the agricultural lands had been sold; so that at the present time the holders of the scrip, if the contention of the defendants is sound, must take lands valuable only for grazing purposes, and not capable of being cultivated. It is clear that this was not the intention of any of the parties at the time of the organization of the company

and the transfer to it of the property, and this is the view that was taken by the court of appeals when the case was before it. Thus, the court said:

"We think that their purpose is clearly indicated by what they said and did, interpreted in the light of the circumstances surrounding them at the time. They intended that the land company should hold one-fourth of the land as its own, and three-fourths in trust to sell for the benefit of the scripholders, until they were paid the face value of their scrip, without interest, when the remainder was to belong absolutely to the company. The certificates were mere instruments of convenience to aid in carrying out the prior contract made by the bondholders with each other. That contract was made by adopting the report of the purchasing committee, and it constituted the only authority that the trustees had to convey the land to the corporation defendant. By accepting title to the land, it (the corporation) adopted and ratified the agreement entered into by all its stockholders, and thereby voluntarily made itself a party thereto and became bound thereby."

It follows that plaintiffs are entitled to an accounting by the company of the amount that it has received by the sale of lands covered by the conveyance to the company, and the disposition of the proceeds thereof. I think it also clear that the trustees of the corporation are proper parties to this action, and are liable to the scripholders for any amount that it shall appear on such accounting was due to them, and which they have appropriated to other purposes. I understand that to be the result of Mr. Justice Barrett's decision upon the demurrer to the complaint interposed by the individual defendants. Here property was conveyed to the corporation subject to a trust for a particular disposition of 75 per cent. of the proceeds of that property; and if the directors, acting for the corporation, have disposed of that trust fund, in violation of the trust, with full knowledge of the facts and the legal rights of the scripholders, they are certainly responsible to the scripholders for the violation of the trust. I think it is also clear that this trust included the lands acquired by the company in consequence of its ownership of the stock of the Texas Land Company. . As to the reissue of the scrip, I think that all scrip purchased by the company and paid for by the 75 per cent. of the proceeds of the lands sold became canceled by its purchase, and the company had no right to reissue it. That would be so where the scrip was purchased by money borrowed by the company, and subsequently repaid from the proceeds of the sale of lands. There must be, therefore, an account taken of the method by which the reissued scrip was acquired by the company, and the source from which the money that was paid for it was derived; and I think the plaintiffs are entitled to have the amount of scrip that was improperly reissued considered as cash paid to the corporation. I think this disposes of all the questions submitted, and there should be an interlocutory judgment for an accounting as herein directed, the question of costs to be left until final judgment, the form of the judgment to be settled on notice. Ordered accordingly.